[Cite as *Boron v. Boron*, 2018-Ohio-69.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| KORENA BORON FERGUSON | ) | CASE NO. 15 CO 0030 |
| | ) | |
| PLAINTIFF-APPELLANT | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| ERIC VAN BORON | ) | |
| | ) | |
| DEFENDANT-APPELLEE | ) | |

CHARACTER OF PROCEEDINGS:    Civil Appeal from the Court of Common
Pleas of Columbiana County, Ohio
Case No. 2009-DR-0585

JUDGMENT:    Affirmed.

APPEARANCES:

For Plaintiff-Appellant:    Atty. Anne S. Margyaros
The Gallery Building
516 E. Washington St.
Chagrin Falls, Ohio  44022

For Defendant-Appellee:    Atty. Christopher A. Maruca
The Maruca Law Firm, LLC
201 East Commerce Street
Suite 316
Youngstown, Ohio  44503

JUDGES:

Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Stephen A. Yarbrough, of the Sixth District Court of Appeals, sitting by
assignment. (Retired)

Dated:  January 5, 2018

WAITE, J.

{¶1} This is an appeal of the denial of a motion for contempt regarding the real and personal property division in a 2013 divorce decree. Appellant Korena Boron Ferguson appeals the judgment of the Columbiana County Court of Common Pleas overruling her motion for contempt against Appellee Eric Boron. Appellant filed a show cause motion in this matter on July 25, 2013, contending Appellee should be held in contempt for failing to transfer real and personal property which had been the subject of the final decree of divorce. Appellee filed a competing contempt motion on September 9, 2013, alleging Appellant failed to return his personal property pursuant to the same divorce decree. After three days of hearings, the trial court overruled both parties' motions, finding that both possessed unclean hands and contributed to the contempt of the other party by their own conduct. The record reveals the trial court did not abuse its discretion in overruling Appellant's motion based upon the unclean hands doctrine and the conduct of the parties. The judgment of the trial court is affirmed.

Factual and Procedural History

{¶2} The parties were married on August 16, 1996 and had no children. They obtained a decree of divorce on June 10, 2013. The parties had a long and acrimonious history. Germane to this appeal, the final divorce decree set forth a number of rights and obligations of both parties relative to the real and personal marital property. The parties owned a number of parcels of real estate during the marriage as well as a great deal of personal property, all of which had painstakingly been addressed in the final decree. The real estate relevant to this appeal includes

the marital home located at 2164 Pearce Circle, Salem, Ohio ("Pearce Circle"); vacant land at 1074 Highway 25, Menlo, Iowa ("Iowa property"); Pure Gold Stables at 3225 and 3228 State Route 45, Salem, Ohio ("Pure Gold"); and a condominium at 1319 Pembrooke Drive #C, Salem, Ohio ("Pembrooke").

{¶3} On July 25, 2013, Appellant filed her first show cause motion requesting, among other things, that Appellee be held in contempt for (1) failing to deliver a quit claim deed to Appellant transferring three parcels into her name; (2) failing to transfer utilities on Pembrooke over to Appellant for uninterrupted service; (3) failing to execute a cognovit note and mortgage deed in the amount of $590,000; (4) failing to provide Appellant with paperwork to transfer her interest in relevant real estate parcels; (5) failing to pay homeowner fees, utilities and taxes on Pembrooke; and (6) failing to relinquish his interest in the Stifel Nicolaus retirement account.

{¶4} On September 9, 2013, Appellee filed a motion to show cause for Appellant's failure to transfer the Pure Gold parcel to him and failure to return Appellee's motorcycle.

{¶5} The first hearing was held on November 19, 2013. Appellant testified regarding the allegations in her motion. Appellant asserted that she was able to enter the Pembrooke property before the divorce trial with an appraiser in order to ascertain the value of the property for rental purposes. Appellant testified that at the time it needed only general cleaning and that no one was living in the condominium. Appellant testified that she was not given keys to the property nor was a quit claim deed for this property drafted by Appellee in a timely manner. Appellant testified that

she finally gained access to this property in October of 2013. She immediately noted damage to the property, including that it emanated a strong smell of cat urine, water was running from the upstairs shower, there was no electric or gas service, and the washer and dryer were missing. Appellant testified about the repairs and cleanup she had performed on the property in order to prepare it for sale or rental.

{¶6} Regarding the taxes, mortgage and note, Appellant contended Appellee had failed to pay real estate taxes that were due on any of the marital real estate up to April 18, 2013, and that she paid the real estate taxes in order to avoid delinquency. Appellant testified that the mortgages presented by Appellee were several months late and contained multiple errors. As a result, she could not sign off on the mortgages. In addition, Appellant testified that the cognovit note to be executed by Appellee in favor of Appellant was also late and contained multiple errors, including that the total amount was set forth as $500,015 when the final divorce decree ordered that the amount of the note was to be $590,000. Finally, Appellant testified that Appellee had not executed the requisite documents to transfer her portion of the retirement account.

{¶7} Appellant filed an amended show cause motion on March 20, 2014, alleging that Appellee had committed additional violations of the decree while the earlier matters were pending before the trial court. In addition to the allegations in the July 25, 2013 show cause motion, Appellant alleged that Appellee contracted to sell the starting gate from the stables as part of a sale of the Pure Gold property. This gate was Appellant's personal property, and she incurred attorney fees in order

to negotiate a return of the gate from the proposed buyers of the property. Appellant also listed a number of debts that Appellee failed to pay as required by the decree, including: electric, plumbing, condo association fees and real estate taxes on the subject parcels.

{¶8} Two additional hearings on the motions were held on June 20, 2014 and October 6, 2014. At the June 20, 2014 hearing, Appellant testified that Appellee's motorcycle had been located on the back deck of the Pembrooke property during the marriage and that it had remained there until Appellee picked it up just prior to the hearing. Appellant stated that she paid the outstanding taxes on the Iowa property as well as the second half of the 2012 real estate taxes on the Ohio properties to prevent delinquency. Appellant also testified about discovering that the sale of the Pure Gold Ranch included sale of the starting gate, which was to be retained by Appellant. She testified that she was forced to hire legal counsel to get back the gate once it was sold by Appellee. On cross-examination, Appellant admitted that she waited more than ten months before attempting to regain this gate.

{¶9} On cross-examination, Appellee admitted that he signed a purchase agreement for the Pure Gold property that included the starting gate prior to the previous hearing without Appellant's knowledge and while her name remained on the deed. Appellee also testified that he still owed real estate taxes on the properties and that he did not cooperate in transferring the Pembrooke property's utilities to Appellant. Appellee also testified that he took the washer and dryer from the Pembrooke property.

{¶10} The third and final hearing was held on October 6, 2014. Appellee testified on direct examination that he had paid the outstanding electric and plumbing bills. On cross-examination, Appellee acknowledged that all of the real estate taxes had been paid but that he had no proof regarding which delinquent real estate taxes had been paid by him and which by Appellant. Appellee also acknowledged that the divorce decree did not specify that Appellant was to deliver his motorcycle. Appellee also acknowledged that he never gave Appellant keys to the Pembrooke property and that there were defects with the quit claim deed his counsel originally presented to Appellant for execution. Appellant then presented expert testimony by Attorney Virginia Barborak regarding the legal fees she incurred related to both the contempt action and negotiation for the return of the starting gate.

{¶11} A magistrate's decision was issued on November 6, 2014. The magistrate determined that neither party had clean hands when they filed their respective contempt motions and overruled these motions. The magistrate also ordered each party to pay their own attorney fees. Appellant filed a motion for findings of fact and conclusions of law on November 13, 2014. Appellee filed objections to the magistrate's decision on November 20, 2014. The court ordered both parties to file proposed findings of fact and conclusions of law and the magistrate issued a decision on January 21, 2015, again concluding that both parties had unclean hands and overruling all of the contempt motions. On January 30, 2015, Appellant filed her objections to the magistrate's decision. On October 23, 2015, the

trial court issued a final judgment entry, adopting the decision of the magistrate. Appellant filed the instant appeal.

ASSIGNMENT OF ERROR NO. 1

THE TRIAL COURT ERRED IN APPLYING THE DOCTRINE OF UNCLEAN HANDS TO BAR APPELLANT RELIEF WHEN THERE WAS A LEGAL REMEDY AVAILABLE TO APPELLEE (CONTEMPT), WHERE SHE WAS NOT GUILTY OF REPREHENSIBLE, UNCONSCIONABLE CONDUCT AND WHERE ANY PERCEIVED CONDUCT HAD NO RELATIONSHIP WITH THE CONTEMPT ALLEGATIONS.

ASSIGNMENT OF ERROR NO. 3

THE TRIAL COURT ERRED IN FAILING TO FIND APPELLEE IN CONTEMPT AND/OR THAT HE FAILED TO COMPLY WITH THE COURT'S ORIGINAL ORDERS.

{¶12} In Appellant's first and third assignments of error she contends the trial court erred in applying the "clean hands" doctrine and in failing to hold Appellee in contempt.

{¶13} An appellate court will not reverse a trial court's judgment regarding contempt absent an abuse of discretion. *State ex rel. Ventrone v. Birkell,* 65 Ohio St.2d 10, 11, 417 N.E.2d 1249 (1981). An abuse of discretion involves more than an error of judgment; it implies that the court's attitude is unreasonable, unconscionable,

or arbitrary. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶14} Contempt proceedings can be either civil or criminal, although the proceedings themselves are *sui generis. Brown v. Executive 200, Inc.,* 64 Ohio St.2d 250, 253, 416 N.E.2d 610 (1980). In civil contempt, the purpose of punishment is to coerce the contemnor to obey a judicial order for the benefit of a third party. *Carroll v. Detty*, 113 Ohio App.3d 708, 711, 681 N.E.2d 1383 (1996). In a civil contempt action the contemnor is said to "carry the keys of his prison in his own pocket * * * since he will be freed if he agrees to do as ordered." *Pugh v. Pugh*, 15 Ohio St.3d 136, 139, 472 N.E.2d 1085 (1984), quoting *Brown* at 253. The burden of proof for the moving party in a civil contempt action is clear and convincing evidence. *Carroll* at 711. Once the moving party establishes a *prima facie* case of contempt, the burden shifts to the nonmoving party to establish a defense. *Morford v. Morford,* 85 Ohio App.3d 50, 55, 619 N.E.2d 71 (1993). The nonmoving party must prove any defense by a preponderance of the evidence. *Jeffers v. Jeffers,* 7th Dist. No. 07 BE 36, 2008-Ohio-3339, at ¶ 15.

{¶15} In the instant case, Appellant contends Appellee violated a number of the provisions contained within the parties' divorce decree, necessitating a finding of contempt against him. For his part, Appellee argues that the trial court did not err in failing to hold either party in contempt. Although multiple provisions of the divorce decree provided a source of animosity, both parties used the provisions essentially

as a weapon with which to aggravate the other. However, the parties ultimately fully complied with the decree and a finding of contempt was not warranted.

**{¶16}** The parties' final divorce decree, entered after protracted litigation, evinced an attempt to thoroughly address each aspect of the parties' divorce and to anticipate and avoid the kind of battle in which the parties seem to nevertheless find themselves embroiled. Appellant raised a number of issues in both her original and amended show cause motions where she alleged Appellee had failed to comply with the divorce decree. At the three hearings, Appellant presented testimony and evidence that Appellee had either failed to comply or failed to comply in a timely manner with his duties and obligations under the decree. Appellant also sought to recover attorney fees incurred in pursuing resolution of the issues surrounding Appellee's alleged contempt.

**{¶17}** Appellee filed his own show cause motion alleging that Appellant should be found in contempt for failing to return his motorcycle and for failing to execute a quit claim deed to transfer the Pure Gold real estate. Appellee provided testimony at hearing on those issues. Appellee has not appealed the trial court's judgment entry regarding the denial of his own motion to show cause.

**{¶18}** The trial court was not persuaded by any of the parties' arguments and, after three separate hearing dates, elected to overrule all motions, citing both parties' unclean hands in the matter. The trial court concluded that through their own individual actions, the parties exacerbated the issues raised in the contempt motions.

The "clean hands doctrine" of equity requires that whenever a party takes the initiative to set into motion the judicial machinery to obtain some remedy but has violated good faith by [her] prior-related conduct, the court will deny the remedy.

*Bean v. Bean,* 14 Ohio App.3d 358, 363-364, 471 N.E.2d 785 (12th Dist.1983).

**{¶19}** A movant cannot obtain relief if the movant's own conduct is reprehensible. *Marinaro v. Major Indoor Soccer League,* 81 Ohio App.3d 42, 45, 610 N.E.2d 450 (1991). The movant's conduct "must constitute reprehensible, grossly inequitable, or unconscionable conduct, rather than mere negligence, ignorance, or inappropriateness." *Wiley v. Wiley*, 3d Dist. No. 9-06-34, 2007-Ohio-6423, at ¶ 15. In order to bar a movant's claims, the movant must be at fault in relation to the nonmovant and in relation to the subject matter on which the movant's claims are based. *Trott v. Trott,* 10th Dist. No. 01 AP-852, 2002-Ohio-1077.

**{¶20}** In *Marinaro*, the court held that the movant had engaged in reprehensible conduct by taking bribes to intentionally lose soccer games. *Id.* at 45. The court concluded that his unclean hands would bar him from enjoining the league from suspending him, even if the suspension was imposed in a manner that did not completely comply with the collective bargaining agreement. *Id.*

**{¶21}** Here, the magistrate's decision dated November 6, 2014 noted:

The Court specifically finds that neither party had clean hands when they filed their contempt motions. All motions for Contempt are therefore **OVERRULED**. Each party shall pay their own attorney fees.

*Id.* at p. 2.

**{¶22}** In the November 6, 2014 entry the magistrate did not specifically delineate the manner in which each party had unclean hands as it pertained to each alleged contempt, but noted:

For a variety of reasons, neither party chose to promptly complete the tasks necessary to fulfill their obligations under the divorce decree. Deeds and mortgages were not promptly prepared, signed or delivered by either party. [Appellee] did not cooperate in turning over ownership of the condo to [Appellant]. [Appellant] did not cooperate in turning over the motorcycle to [Appellee]. Counsel exchanged numerous correspondences regarding the exchange of assets, and the parties remained at a standoff. Neither party wanted to be the first to comply, so neither party complied. It was the classic standoff with neither party showing any willingness to blink.

The only good news is that by the last hearing date on these Motions (November 6, 2014) both parties were in substantial compliance with the terms of the final decree. All real estate had been transferred; Pure Gold had been sold; [Appellee's] total spousal support obligation was paid in full; [Appellant] had possession of the condo; [Appellee] had possession of the motorcycle, and all debts are paid.

*Id.* at pp. 1-2.

**{¶23}** Appellee filed objections to the magistrate's decision on November 20, 2014. Appellee contended the magistrate erred in ordering Appellee to reimburse Appellant for Iowa real estate taxes because the taxes were paid as of the date of the April 2013 final divorce hearing.

**{¶24}** Before filing her own objections, Appellant filed a request for findings of fact and conclusions of law and the trial court ordered the parties to submit proposed findings and conclusions pursuant to Civ.R. 53(D)(3)(ii). On January 21, 2015 the magistrate issued a decision containing findings of fact and ordering that the "Conclusions of Law remain as set forth in the Magistrate's Decision and Judgment Entry filed on November 6, 2014." (1/21/15 Mag. Dec., p. 4.) The trial court adopted the magistrate's decision on the same day, January 21, 2015.

**{¶25}** Appellant filed objections to the January 21, 2015 magistrate's decision on the basis that the court: (1) failed to prepare proper findings of fact and conclusions of law; (2) erred in failing to hold Appellee in contempt; (3) erred in finding Appellant had not complied with the divorce decree; (4) erred in finding the attorneys had communicated but did not coordinate the transactions needed to complete obligations under the decree; and (5) erred in finding Appellant was required to remove the starting gate from the Pure Gold property.

**{¶26}** A non-oral hearing on both parties' objections was set for May 29, 2015. In its final judgment entry dated October 23, 2015, the trial court addressed all of the objections. Regarding Appellant's argument that the magistrate simply referred to the previous conclusions of law contained in the November 6, 2014

magistrate's decision, the court held that there was "substantial compliance" with the civil rules when the magistrate's decisions of November 6, 2014 and January 21, 2015 were considered in totality with the entire trial court record.

**{¶27}** Regarding the magistrate's finding that both parties had failed to comply with the terms of the divorce decree before the judgment entry was even filed, the final hearing where the agreement was read into the record occurred on April 30, 2013, but the judgment entry was not filed and time stamped until June 10, 2013. The court concluded that by this date, the parties had already failed to comply with various provisions. The magistrate observed that the divorce decree "clearly obligates [Appellant] to make available to [Appellee] a 1998 Yamaha V Star Motorcycle (Motorcycle) within fourteen days of April 18, 2013." (10/23/15 J.E., p. 5.) Despite multiple letters and attempts to recover the motorcycle, Appellant refused to make the motorcycle available and testified that she had not contacted Appellee about the motorcycle or allowed him to pick it up. The court noted that Appellant admitted she had thrown away motorcycle rims and other personal property belonging to Appellee, contrary to the terms of the divorce decree. Based on these two infractions, the trial court concluded that Appellant violated the decree.

**{¶28}** Regarding attorney communication, the court held that the parties' attorneys failed to communicate about the parties' obligations under the decree. Although Appellant testified that she was not aware of communications by her attorney on her behalf, and her counsel stated that she did not receive certain communications, the court stated that these were included in her file and that "certain

documents had been prepared and/or recorded by co-counsel for [Appellant]" but because of the lack of communication, Appellant's counsel was unaware of these documents. (10/23/15 J.E., p. 7.) The court concluded that the failure of counsel to communicate effectively resulted in a failure to timely complete the matters required under the decree.

{¶29} Appellant also objected to the magistrate's finding that Appellant failed to cooperate and that the parties were at a standoff. The court held:

> [Appellant] did not make the Motorcycle available to [Appellee] and she disposed of his personal property. The record also supports that the parties were at a standoff. Due to the lack of communication and cooperation from [Appellant], [Appellee] reciprocated. [Appellee] did not communicate or cooperate with [Appellant] regarding the keys to the Pembrooke condominium or transferring the utilities into her name. [Appellee] did not discuss with [Appellant] the insurance he had obtained on Pure Gold. [Appellant] incurred the cost of changing the locks at the Pembrooke condominium for reasons including that she never asked [Appellee] for the keys and because she failed to respond to the letters from counsel for [Appellee] about the Motorcycle.

(10/23/15 J.E., p. 8.)

{¶30} Appellant objected to the magistrate's failure to address each of her allegations of contempt. The court noted that the magistrate had considered all the evidence and testimony before him. Appellant did not have clean hands due to her

conduct regarding the motorcycle and Appellee's personal property, and Appellee did not have clean hands because of his failure to cooperate or communicate regarding the Pembrooke property keys, transferring the Pembrooke utilities, or obtaining insurance on the Pure Gold property. The court noted that as neither party had clean hands, the magistrate was not required to further address the contempt motions.

{¶31} Regarding Appellant's objection about the starting gate at Pure Gold, the trial court acknowledged that it had been awarded to Appellant in the divorce, but observed that she waited several months before attempting to retrieve it. There was no evidence that Appellee attempted to remove it or prevent her from taking the starting gate. The court concluded Appellant knew Appellee had the right to negotiate a sale of the Pure Gold property, and there was no evidence that Appellee purposely included the gate in the terms of sale. In fact, Appellee had communicated to his counsel that Appellant could pick it up prior to the sale. Appellee did not secretly sell the gate or withhold the sale proceeds from Appellant. It was also noted that Appellant ultimately negotiated a sale price and sold the starting gate to the buyer of Pure Gold for $5000, which was her asking price. (10/23/15 J.E., p. 10.) The court concluded it was Appellant's conduct that led to the starting gate's inclusion in the sale of Pure Gold because she failed to promptly claim her property. Based on this, the court concluded her unclean hands prevent Appellant from recovering attorney fees.

{¶32} Regarding Appellant's objection to the real estate expenses and obligations for the various Ohio parcels and the Iowa parcel, the trial court concluded

the language in the decree was "confusing" and the parties' counsel disagreed on its meaning.

**{¶33}** Article Seven of the decree contains agreed language relating to debts, and provides:

> Husband shall be solely responsible for and indemnify Wife for any and all debts associated with the horses (Article Five), real estate expenses/obligations (Article Eight) including but not limited to any and all real estate taxes for first half of 2012 (and payable in 2013) for all real property including Pearce Circle, Pembroke [sic], Pure Gold, Pennsylvania properties and Iowa, all condominium or homeowners association fees through April 18, 2013, any debt owed to Ellyson Plumbing and Jillian Electric, and all business liabilities, taxes, debts, obligations (Article Six).

(6/10/13 J.E., p. 15.)

**{¶34}** While the court agreed that the language of the agreement unambiguously required Appellee to pay the debts and obligations as specified, the agreement "does not include a specific date or time by which payment must be made." (10/23/15 J.E., p. 13.)

**{¶35}** In Article Nine of the decree, Appellant was to retain the Iowa and the Pembrooke properties following divorce. Regarding the taxes and utilities, the language reads, "[w]ife shall be solely responsible for any and all utilities, real estate

taxes, homeowners/hazard insurance from April 18, 2013 forward." (6/10/13 J.E., p. 17.)

**{¶36}** The court noted that although the decree contains a date certain for the commencement of duties and obligations (April 18, 2013), it does not require the parties to perform any of the duties or obligations at issue by an established deadline. Further, both parties took advantage of the lack of a deadline by failing to act in a timely manner. Therefore, the court reasoned that Appellant's arguments Appellee failed to perform by a certain deadline were not well founded and Appellant failed to establish by clear and convincing evidence that Appellee was in contempt.

**{¶37}** We must note that the court incorrectly stated the decree did not contain a deadline for performance. Article Nine, relating to the transfer of the Iowa and Pembrooke properties to Appellant by Appellee, was to be completed within thirty days of April 18, 2013. Similarly, Appellee was to ensure that the utilities for Pembrooke were transferred to Appellant within thirty days of April 18, 2013. Finally, in exchange for Appellant executing a quit claim deed for the Pure Gold property, Appellee was to execute a cognovit promissory note and mortgage deed to Appellant in the amount of $590,000. Final payment on the note was due and owing no later than October 18, 2014. Thus, the decree did contain specific deadlines and dates for performance which were not adhered to. Most of these dates fell before the parties' final decree was even filed. The court clearly weighed Appellee's failure to perform, here, with Appellant's failure to timely remove the starting gate from the Pure Gold property, make Appellee's motorcycle available to him, and her disposal of Appellee's

personal property. While the decree did not provide a date by which Appellant was to remove her gate from the Pure Gold property and there was no provision obligating Appellant to deliver the motorcycle, the court was not dealing with true "one for one" bad behavior of the parties. However, a reviewing court does not reweigh evidence of this nature and a trial court has great discretion in this area.

**{¶38}** Regarding the failure by Appellee to timely execute a cognovit note and mortgage on the Pure Gold property as well as his failure to execute and deliver quit claim deeds for the Iowa, Pembrooke and Pearce Circle properties, the trial court concluded Appellee was not in contempt. Utilizing the clean hands doctrine, the trial court stated: "There is a connection between the conduct of [Appellant] and the claimed failures of [Appellee]. One cannot be viewed without the other." (10/23/15 J.E., p. 15.) In addition to the fact that the parties did not communicate, the court noted that Appellant did not sign the quit claim deed to the Pure Gold property presented to her, did not communicate and cooperate regarding the motorcycle's return and disposed of some of Appellee's personal property. Hence, she came into the contempt proceedings with unclean hands. Similarly, the trial court concluded that Appellee's failure to transfer the Pembrooke utilities and the keys to the Pembrooke property, as well as failing to timely deliver deeds to the Iowa, Pembrooke and Pearce Circle properties also showed that he did not come into the contempt proceedings with clean hands. The trial court reasoned that both parties' conduct in effect cancelled each other out, precluding a finding of contempt for either party.

**{¶39}** As noted, the clean hands doctrine, as it is known, dictates that where a party's own conduct is reprehensible, grossly inequitable, or unconscionable, that party is not entitled to recover in a contempt proceeding. *Wiley*, *supra*, at ¶ 15.

**{¶40}** This record does reflect that both parties acted in a manner intended to thwart and agitate the other and further complicate an already acrimonious relationship. Appellee's misconduct was directly contrary to the timelines and dictates of the decree and Appellee presented no evidence to justify his failure to act in a timely manner. Appellee admitted that real estate taxes were due and owing on the properties and he had not made payment prior to the final contempt hearing. (6/20/14 Tr., p. 45.) Appellant presented evidence that the mortgage and cognovit note presented by Appellee in November of 2013, prior to the first contempt hearing, did not comply with the court's order, as it contained a reservation of mineral rights, listed the wrong address and secured only $500,015, rather than the $590,000 required in the decree. (11/19/13 Tr., pp. 32, 66.) Finally, the quit claim deed for the Pure Gold property presented by Appellee to Appellant was defective in that it listed the wrong county and state, contained an incorrect address and included a reservation of mineral rights. (11/19/13 Tr., pp. 31-32.)

**{¶41}** The record does show that the trial court's reference to Appellant's failure to sign the deeds presented to her in a timely fashion cannot be deemed misconduct where the deeds were defective. Moreover, the trial court's reference to Appellant's failure to communicate and cooperate regarding the motorcycle does not, standing alone, appear to rise to contemptible behavior. Evidence at the hearing

showed, however, that Appellant deliberately failed to respond to letters from Appellee's attorney regarding exchanging the motorcycle for keys to the Pembrooke properties. While Appellant's conduct regarding the motorcycle is not directly tied to the transfer of real estate and payment of real estate taxes by Appellee, both parties deliberately used the tools at their disposal to cause hardship to the other. The clean hands doctrine applies, here, and the court has wide discretion in determining matters of contempt. The trial court did not abuse its discretion in overruling the contempt motions under this doctrine. Appellant's first and third assignments of error are without merit and are overruled.

ASSIGNMENT OF ERROR NO. 2

THE TRIAL COURT ERRED IN FAILING TO ADDRESS EACH PRONG OF APPELLANT'S MOTIONS TO SHOW CAUSE/MOTION FOR CONTEMPT.

**{¶42}** In her second assignment of error Appellant contends the trial court erred in failing to address all of the assertions in her motion for contempt.

**{¶43}** The purpose of civil contempt is to ensure the dignity of the courts and the fair administration of justice. *Pugh*, *supra*, at 139. As noted, the party bringing an action for contempt has the burden of producing clear and convincing evidence of contempt by the other party. *Id.*

**{¶44}** A review of the trial court's judgment entry reveals that each of Appellant's concerns regarding contempt were addressed, either individually or collectively. Utilizing the clean hands doctrine as noted above, the trial court stated

in addressing each issue raised by Appellant's objections that it was Appellant's own conduct as well as the conduct of Appellee that lead to its decision. The court also took note of the fact that all outstanding issues under the decree had been substantially completed by the final hearing in this matter to determine that a contempt finding was not warranted. Appellant's second assignment of error is without merit and is overruled.

<u>ASSIGNMENT OF ERROR NO. 4</u>

THE TRIAL COURT ERRED IN FAILING TO ORDER APPELLEE TO PAY DAMAGES AS A RESULT OF HIS FAILURES TO COMPLY WITH THE FINAL DECREE INCLUDING ATTORNEY FEES AND EXPENSES.

**{¶45}** In her fourth assignment of error, Appellant contends the trial court erred in failing to order Appellee to pay damages for violating the divorce decree, including her expenses and attorney fees.

**{¶46}** Appellant sought reimbursement for real estate taxes, insurance, utilities, condo fees, repairs to Pembrooke, rental revenue lost and attorney fees associated with the contempt action.

**{¶47}** The parties' divorce decree provided for damages in various contexts for failure to comply. Article Seven and Article Seventeen of the parties' separation agreement, incorporated into the decree, provides language as to indemnification for Appellee's default in paying the debts listed. Article Seven concerns real estate expenses/obligations, including real estate taxes for first half of 2012; real estate

taxes for all other real property owned by the parties; all condo and homeowners association fees through April 18, 2013; and plumbing and electric debts. The court concluded that Appellant's contention she was entitled to reimbursement for paying real estate taxes that were Appellee's obligation was not established by clear and convincing evidence.

> Indemnity shifts the entire loss from one who has been compelled to make payment to the plaintiff to another who is deemed responsible for reimbursing the full amount. The right to indemnity exists when the relationship between the parties requires one to bear the loss for the other. This right may arise from common law, contract, or in some cases, statutes.

*Portsmouth Insurance Agency v. Medical Mutual of Ohio,* 188 Ohio App.3d 111, 2009-Ohio-941, 934 N.E.2d 940, ¶ 16 (4th Dist.). Indemnity agreements are interpreted in the same manner as other contracts. *Id.* at ¶ 18. The true nature of an indemnity relationship is determined by the intent of the parties expressed within the language of the agreement. *Id.*

**{¶48}** The parties' agreed language provided that Appellee was solely responsible, and was to indemnify Appellant, for real estate taxes incurred on all of the parties' properties through April 18, 2013, including any and all real estate taxes from the first half of 2012. (6/10/13 J.E., p. 15.) Appellant had the burden of presenting evidence that she paid real estate taxes that were the sole responsibility of Appellee. The trial court concluded that Appellant failed to meet that burden. At

the first of the three contempt hearings, Appellant testified that the real estate taxes on the properties had not yet been paid. Appellant requested that the trial court order Appellee to pay the taxes due. (11/19/13 Tr., pp. 26-27.) At the second hearing, Appellant testified that she paid the real estate taxes for the second half of 2012, and presented copies of tax bills showing payment of delinquent taxes for the second half of 2012 with the first half remaining due. Appellant sought reimbursement for the taxes she had paid and payment for the first half of 2013, as Appellee had failed to transfer the properties to her by that time. (6/20/14 Tr., pp. 6-8). However, as the court noted, Appellee was only responsible for the real estate taxes through the first half of 2012, which were payable in 2013. Therefore, Appellant's request for reimbursement for taxes incurred the second half of 2012 and beyond was contrary to the language of the separation agreement. Appellant also failed to demonstrate that she had paid any condominium association fees or other related expenses on the properties before April 18, 2013. Appellee's responsibility under the decree ended on that date. Therefore, the trial court did not abuse its discretion in finding Appellant was not entitled to reimbursement under the indemnity provision of the decree.

**{¶49}** In Article Seventeen there appears a clause entitled "Costs Upon Default/Damages" which reads:

> If either the Husband or the Wife should default in the performance of any term or provision of this Agreement, the purpose of the agreement would be frustrated. It is each party's intent that neither should be

required to incur any expenses associated with the enforcement of his or her rights under this agreement because the cost/expense thereof would substantially detract from the benefits intended for each of them. Therefore, if the non-defaulting party deems it necessary to engage counsel and/or institute legal proceedings to effect or compel performance of any provision of the Agreement, in such event the Court hearing such proceeding may in its discretion award reasonable attorney fees for all legal services rendered to and on behalf of such complaining party relating thereto including but not limited to those incurred to initiate such proceeding and those incurred with respect to pre-proceeding and post-proceeding legal services. The parties shall make documented efforts to gain the other's compliance prior to incurring any legal fees.

In addition, the parties agree that either party that defaults and is found in contempt of court in the performance of any obligation set forth in the Agreement shall pay all "damages" associated with said default. "Damages", as the term is used herein and elsewhere in this Agreement, shall mean all loss associated with the party's default including but not limited to liability, expenses, taxes, charges, principal, interest, court costs, penalties, and legal fees both in defense of any action and in prosecution of any action.

In addition, the parties agree that each party shall fully indemnify the other for all obligations that they are responsible to perform as set forth in this Agreement. Nothing contained in this Article shall be construed as a release of any obligation of either party as set forth in the Agreement.

(6/10/13 J.E., pp. 21-22.)

{¶50} Appellant sought damages for utilities, repairs and condo fees relating to the Pembrooke property for Appellee's failure to transfer the property by the deadline contained in the decree. Appellant seeks: (1) repair costs to the condo, as she alleges it was left in disrepair and Appellee failed to promptly transfer the property to her; (2) payment for all insurance, condo fees, taxes and utility expenses for the time period in which she was awaiting transfer of the property; (3) payment for rental revenues lost as a result of Appellee's failure to timely execute the deed to Pembrooke; and (4) attorney fees and expenses incurred as a result of Appellee's failure.

{¶51} At hearing, Appellant testified that she brought in an appraiser to assess the rental value of the Pembrooke property prior to the divorce. She stated that when she finally obtained access to the property in September of 2014, she immediately noticed the smell of cat urine and that the washer and dryer were missing, the upstairs shower was running, and the gas and electric service had been turned off. (11/19/13 Tr., pp. 13-17.) She testified that the carpets had to be replaced, the cement flooring underneath resealed, the furnace repaired and the

washer and dryer replaced. (11/19/13 Tr., pp.14-17.) Appellant presented evidence of damages, including $1,684.96 for repair of the flooring and replacement of carpeting, repair of the heating unit in the amount of $840.52, and condo association fees of $530 for the months of May through August of 2013 because she alleges she did not have access to the property. Appellant also seeks reimbursement for real estate taxes for the six months she allegedly could not use the property and a loss of rental value at $575 per month for the five months she claims she was denied access to the property, totaling $2,875.00.

**{¶52}** The trial court concluded Article Seventeen provides that only a nondefaulting party may recover damages, and that Appellant was also in default of portions of the decree by her own conduct. Further, the trial court concluded Appellant presented no evidence of her efforts to gain compliance before incurring attorney fees, and that her own unclean hands prevent her from recovering any damages under the terms of the separation agreement.

**{¶53}** Looking to the language utilized by the parties in the agreed portion of the decree, it is clear that the parties intended to be unambiguous in setting forth the terms for obtaining damages for default. The acrimonious nature of the years-long divorce followed by a multi-day trial evidenced a need for such language in the event of default. The definition of "damages" within the decree is broad, but not all encompassing. There is no provision for lost rental payments. Similarly, the Pembrooke washer and dryer are personal property belonging to Appellee, and this language cannot be used to recover alleged damage for loss.

**{¶54}** Appellant's first motion to show cause was filed just a few weeks after the journalization of the decree, leaving little doubt that not much communication or effort at obtaining compliance was made by Appellant before seeking redress in the courts. As noted, she provided no evidence of the efforts made to seek compliance from Appellee with regard to the areas in which she sought relief. Without reaching out in a good faith attempt to resolve the issues, and sitting idly by while tax bills became delinquent and property began to fall into disrepair, Appellant cannot with clean hands seek redress within the courts.

**{¶55}** Regarding Appellant's assertion that she is entitled to recover attorney fees incurred in pursuing her contempt action, Article Seventeen specifies that attorney fees may be awarded in any action for contempt at the court's discretion. Any trial court may, within its discretion, include an award of attorney fees as part of costs taxable to a party found in civil contempt. *Planned Parenthood Assoc. of Cincinnati, Inc. v. Project Jericho*, 52 Ohio St.3d 56, 67, 556 N.E.2d 157 (1990).

**{¶56}** Appellant provided expert testimony at hearing from Attorney Virginia Barborak regarding the reasonableness of the attorney fees she incurred in pursuing her contempt action. Appellant asserts that her attempts to obtain compliance prior to seeking redress in court were many and lengthy, but does not refer to any evidence in the record to support such a claim, nor was any evidence of her attempts to obtain compliance prior to filing her show cause motion presented at hearing. Again, it is telling that Appellant filed her show cause motion just weeks after the

journalization of the divorce decree. We cannot conclude based on the record before us that the trial court abused its discretion in failing to award Appellant attorney fees.

**{¶57}** Thus, the record reflects that the trial court did not err in denying Appellant damages. Appellant's fourth assignment of error is without merit and is overruled.

<u>ASSIGNMENT OF ERROR NO. 5</u>

THE TRIAL COURT'S FINDINGS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶58}** In her fifth assignment of error, Appellant contends the trial court's judgment is against the manifest weight of the evidence. Appellant provides a list of instances in her appellate brief where she essentially disagrees with the trial court's findings on a number of evidentiary issues.

**{¶59}** As noted, a trial court's decision in a contempt proceeding will not be disturbed absent an abuse of discretion. *State ex rel. Ventrone v. Birkel*, 65 Ohio St.2d 10, 11, 417 N.E.2d 1249 (1981). The trial court is in the best position to judge the credibility of testimony because it can observe the witness's gestures and voice inflections. *Seasons Coal Co. v. Cleveland,* 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984). A reviewing court will not reverse a trial court's factual findings that are supported by some competent, credible evidence. *C.E. Morris Constr. Co. v. Foley Constr. Co.,* 54 Ohio St.2d 279, 280, 376 N.E.2d 578 (1978).

**{¶60}** The Ohio Supreme Court has defined "contempt of court" as "disobedience of an order of a court. It is conduct which brings the administration of

justice into disrespect, or which tends to embarrass, impede or obstruct a court in the performance of its functions." *Windham Bank v. Tomaszcyk,* 27 Ohio St.2d 55, 271 N.E.2d 815 (1971), paragraph one of the syllabus.

**{¶61}** "Weight of the evidence concerns the 'inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12. In considering a challenge to the manifest weight of the evidence, the reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *In re A.S.,* 7th Dist. No. 11 JE 29, 2012-Ohio-5468, ¶ 10.

**{¶62}** In weighing the evidence, a reviewing court must be mindful of the presumption in favor of the finder of fact. *Id.* In determining whether the trial court's decision is manifestly against the weight of the evidence, "every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *Eastley* at ¶ 21. "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Id.*

**{¶63}** The record contains a variety of instances of bad faith and misconduct on the part of both parties, including Appellant. She failed to return Appellee's

property, disposed of property, and failed to communicate regarding completion of tasks pursuant to the decree. The evidence presented demonstrated that several letters were sent to Appellant through her counsel in order to attempt to complete certain transactions, although it is also clear that Appellee also willfully dragged his feet in completing required tasks.

{¶64} Appellant did not communicate with Appellee regarding the status of his motorcycle or his other personal property. Appellee filed his own contempt motion regarding the status of the motorcycle, which the trial court also overruled. Appellant disposed of Appellee's personal property without attempting to communicate with Appellee about this property. Counsel for both parties proved ineffectual in assisting the parties in communicating during this time period and between the hearing dates on the pending contempt motions. Although Appellant presented testimony from Attorney Barborak regarding attorney fees, there was no evidence that Appellant made attempts at obtaining compliance before seeking redress, as required in the decree. Although Appellant complained about the sale of her starting gate, she failed to collect her property for a period of several months and her dilatory action contributed to the inclusion of the gate in the sale of the Pure Gold property. Appellant did not present evidence that demonstrated Appellee committed waste or destruction of the Pembrooke property to warrant recovery for damages. The trial court ultimately held that, as both parties had unclean hands, the contempt motions were overruled. Appellant disagrees with the factual findings made by the trial court based on the evidence the parties presented, and with the legal conclusions the court

draws. A review of the record reveals that the trial court, after three separate hearing dates with testimony from both parties and the submission of all evidence, painstakingly went through the record and determined that unclean hands precluded either party from recovering for contempt. The trial court was well within its discretion in deciding that Appellee should not be held in contempt for his actions. As such, the judgment of the trial court was not against the manifest weight of the evidence. Appellant's fifth assignment of error is without merit and is overruled.

{¶65} In conclusion, the parties, through their poor and intentionally antagonistic behavior, reached a stalemate in which each appeared to be unwavering in their refusal to cooperate with even the agreed terms of their own divorce decree. The parties behaved obstinately with little to no communication between counsel on any issues. While it is clear that Appellee did not comply with all of his duties and obligations, by the third hearing, both parties had finally complied, albeit much later than required. It is also clear that the parties and their counsel had a difficult time reaching any sort of agreement on basic communication, let alone adhering to the terms of the divorce decree. As such, we cannot conclude the trial court abused its discretion in overruling all of the parties' show cause motions. The judgment of the trial court is hereby affirmed.

Donofrio, J., concurs.

Yarbrough, J., concurs.